SAM RIKALA v. RUNDQUIST CONSTRUCTION COMPANY
AND ANOTHER.
VALDIMAR BJORNSON, STATE TREASURER, CUSTODIAN
OF SPECIAL COMPENSATION FUND.

77 N. W. (2d) 551.

June 1, 1956—No. 36,709.

*Miles Lord,* Attorney General, and *Robert Latz,* Special Assistant Attorney General, for relator.

*Hansen, Hazen & Lynch* and *Donald J. Merriman,* for respondent.

NELSON, JUSTICE.

Certiorari to review an order of the Industrial Commission.

Employee was injured March 4, 1943, while in the employ of the Rundquist Construction Company, due to falling rock. He suffered injuries consisting of a fracture of the shaft of the left femur, a fracture of the left acetabulum, and a fracture of the inferior ramus of the right pubis.

The petitioner and respondent, herein, will be referred to as employee, or as Rikala; the employer and insurer as employer-insurer; and the state treasurer, custodian of the special compensation fund, as relator.

Rikala filed his initial claim petition for compensation against employer-insurer September 1, 1944. Thereafter several hearings were held before a referee and findings and determination by referee

filed June 11, 1946. A second proposed discontinuance of compensation payments was filed in November 1949, followed by an additional claim petition in December 1949. The matter was then determined by the referee pursuant to stipulation of settlement entered into between Rikala and employer-insurer on which there was a hearing and the filing of an award on stipulation May 2, 1951. Thus, Rikala compromised his claim for permanent total disability with the employer-insurer, and by offering said stipulation reached payment of full liability for compensation in a total sum of $9,620.27, exclusive of all other benefits such as medical and hospital benefits paid by the employer-insurer up to May 2, 1951.

At the time of the hearing on the matter of award on the stipulation, it appears to have been Rikala's contention that all of his disabling difficulties resulted from the accident. At the same time the employer-insurer contended that the employee had reached an end result from his injuries; that they were not totally disabling; and that, if Rikala was in fact totally disabled, it was due to other conditions which were not traceable to the accident. It was stated that the settlement then entered into covered all future medical, disabilities, and other cost items and expenses, the same also to include an attorney's fee to be allowed employee's counsel.

Upon being questioned by the referee at the hearing on the stipulation for an award, the employee in effect answered the referee that, upon receipt of payment pursuant to the granting of the award and after payment of his attorney's fee, the award would constitute a final settlement of his claim, and he offered the assurance at that time that he understood that there were to be no further lawsuits for him in the matter after that date. Thereupon he asked the referee to approve his settlement, again stating that upon receiving this payment on award in full he did understand that it closed out all further lawsuits in the matter. The award provided that when the payments therein ordered and approved "have been due and well made they shall constitute a full, final, and complete settlement forever for any and all claims whatsoever which the employe

may have in this matter by reason of an accidental injury occurring to him in said employment on March 4, 1943."

Approximately 30 months later, in November 1953, Rikala filed his petition under M. S. A. 176.121 wherein he made a claim against the special compensation fund of which the state treasurer is custodian and from which an employee may be entitled to receive benefits, providing he meets the terms and provisions of § 176.13 of the Workmen's Compensation Act. This proceeding was intended when brought to first recover the balance of the total recovery provided for when permanent and total disability exists, and where the situation has arisen whereby injuries resulting in disabilities have been compromised with the employer-insurer and pursuant to award on stipulation entered as a settlement and payment in full, but less than the statutory limit, and which disabilities it has been therein alleged coupled with a previous disability, rendered the employee permanently and totally disabled. It appears that this claim petition was the first of two planned in this matter in order to establish the right of the employee to receive benefits from the special compensation fund. This first claim petition was brought to recover the difference between the award on stipulation and full compensation for permanent and total disability as are in such cases provided for by the workmen's compensation laws of the State of Minnesota. If thus an award should be granted to Rikala allowing a payment of $379.73 against the special compensation fund, it is assumed that then the employee would have been paid the full amount of $10,000 for permanent and total disability qualifying him to file a second petition against the special compensation fund for $5,000 under the provisions of § 176.13.

This matter came on for hearing before a referee; two lay witnesses appeared, namely, the wife of Sam Rikala and a Mrs. Lahti, who had known the Rikalas since 1910, having lived in the same vicinity. Their testimony was to the effect that employee had suffered from rheumatism in the year 1933 or 1934; that he was sick for a period of weeks or months at that time, was under a doctor's care, but recovered from the illness, even though it was severe, so that he was able to get up and go to work again. The wife's testi-

mony was to the effect that his knees were stiff and his feet were somewhat stiff, and that naturally his hands and all were stiffer thereafter than before he had that rheumatism. She further stated that he was not confined to his bed any more, but that he always complained about aches in his feet and his back. The testimony indicates that he had no sickness after that summer but that his feet and knees were stiffer and that he complained about his hips. Mrs. Lahti testified that Mr. Rikala was sick in the early 1930's; that he had rheumatism and was unable to work at one time. She noticed later that his joints appeared to be stiff and that he "walked kind of stooped"; that it seemed to stay about the same but he was able to work after that.

It appears that Rikala went to see Dr. H. E. Bakkila of Duluth, Minnesota, November 27, 1953, for an examination. There is no evidence that he had previously consulted this doctor. The doctor testified that he was given a history of Rikala's injury of March 4, 1943, and also a history of arthritis of the back and knees previous to the injury. Dr. Bakkila took X-rays which showed marked hypertrophic changes of the lumbar spine with compression of the last lumbar vertebra and wedging of the 11th and 12th thoracic and first lumbar vertebra. The X-rays also disclosed an old fracture of the pubis; marked hypertrophic changes of both hip joints; old fractures of 7th, 8th and 9th ribs. The doctor gave his opinion that Rikala was totally and permanently disabled; also stated it to be his opinion that this permanent disablement was due to *arthritis plus the injuries.* Dr. Bakkila stated that hypertrophic arthritis was really very extensive; that it antedated the accident; and that it would be a disabling factor.

Dr. Harvey Nelson of Minneapolis had examined Rikala June 14, 1945. His report was received in evidence as an exhibit. It appears that he received a history of the same injury from the employee; that at that time his present complaint was aches in lower back and occasional pain in right hip; that his left leg ached constantly; and that he used a cane all the time whenever he went outside. He was 57 years of age at the time of the injury and 59 years of age when examined by Dr. Nelson. There was at that time no claim of any

discomfort in the head, neck, or upper extremities. X-rays were taken in Dr. Nelson's office of the lumbar spine, pelvis, and left femur. The X-rays included all of the lumbar vertebrae and the 12th thoracic and disclosed an extensive amount of hypertrophic arthritis with very prominent spur formation throughout this portion of the spine. There was no demonstrable fracture in the lumbar vertebra. There was some excessive sclerosis in the region of the right side of the opposing surfaces of the 4th and 5th lumbar vertebrae. The X-rays revealed rather marked arthritic changes about the left hip joint and to a lesser degree the right with sclerosis and narrowing of the articular cartilage. As of the time of this examination, the left femur had firmly united and the fracture of the left acetabulum was firmly united in excellent position. It appeared that there was present extensive arthritic changes in both hip joints; that these were present prior to the accident; and that there was extensive hypertrophic arthritis of the spine. Dr. Nelson reported the healed fracture of the inferior ramus of the right pubis in excellent position. He stated that employee had a very extensive hypertrophic arthritis which undoubtedly caused him some discomfort; that injury to the back in the presence of such arthritic changes of course might cause discomfort for a prolonged period of time; that in addition to the injuries the patient had arthritic changes in both hip joints; and that the actual arthritis was a condition or disease and not then due to the present trauma. In other words, he did not consider it due to injury. Dr. Nelson stated, however, that one could hardly deny that a fracture actually through the acetabulum might have aggravated the symptoms in the hip joint and that, if so, this would have to be considered in the estimation of permanent disability. Dr. Nelson further stated that he did not believe that there had been any demonstrable aggravation of the arthritis as such. He concluded, based upon his findings, that Rikala had a permanent disability of 35% loss of function of the left leg as a result of the injuries to the hip joint and the shaft of the left femur. He further said he believed that there were forms of light work that Rikala could do consistent with that permanent disability and the natural disease and age changes that he was having at that time.

The referee found that Rikala prior to the accident of March 4, 1943, had suffered from arthritis which disease had resulted in a residual physical ailment, which physical ailment, coupled with the results of the accident, rendered him permanently and totally disabled, but that the physical ailment which existed prior to March 4, 1943, was a normally progressive developmental disease and existed independently of an accidental injury, and that under those conditions it did not constitute a preexisting disability within the meaning of the Workmen's Compensation Act. The referee therefore denied recovery from the special compensation fund.

Rikala appealed to the Industrial Commission. The commission, one commissioner dissenting, held employee entitled to recover from the special compensation fund and reversed the findings of the referee to conform. It held that, due to the residuals from the earlier arthritic condition, Rikala was permanently and totally disabled and unable to pursue a gainful occupation. No direct finding appears to have been made in the majority opinion that the employee suffered an injury, of itself causing only permanent partial disability, which, combined with the previous disability, would in fact cause permanent total disability. The commission made no express "finding" of disability prior to the accident but found that the employee suffered from an arthritic condition prior to the accident; that some 10 years prior to March 4, 1943, employee had been disabled by a siege of rheumatism; and that he had recovered from this condition with certain residual impairments to his feet, hands, and back, the condition persisting up to March 4, 1943.

■ The evidence in the record does not show that Rikala, as a result of this rheumatic or arthritic condition, was at any time disabled or impaired from performing his job as a laborer with employer, and no fellow employee was called to testify as to his disability. The burden of proof as to previous disability rests on the employee. The record indicates that a Dr. Sarff saw him after he returned to his home and after he had been at the hospital for some 4½ months following the injury. It appears that he had seen a Dr. Hokum of Duluth, a Dr. Rokala of Virginia, and a Dr. Neff of Virginia, from whom he was receiving weekly treatments at the time

of his examination by Dr. Nelson. There is no evidence of any disability in any other regular employment performed by the employee, except, in a vague way as to performing his own farmwork, which appeared from testimony on the part of his wife and Mrs. Lahti, and no medical testimony of doctor attending him prior to his injury as to any disability existing prior thereto. Rikala when questioned by Dr. Nelson answered his inquiry as to previous illness by saying that he had had no serious illnesses. It goes without saying that a person afflicted with arthritis will have perhaps more than occasional aches and pains and some stiffness. An accidental injury may cause an aggravation thereof or there may be a flareup due to a preexisting arthritic condition, and such aggravation may contribute to an employee's permanent partial disability or permanent total disability, but in the case of such aggravation due to injury the employer-insurer would be responsible for the disability caused by such aggravation and not the special compensation fund. See, Senske v. Fairmont & Waseca Canning Co. 232 Minn. 350, 45 N. W. (2d) 640; Enkel v. Northwest Airlines, Inc. 221 Minn. 532, 22 N. W. (2d) 635; Skoog v. Schmahl, 198 Minn. 504, 270 N. W. 129.

There is no evidence showing that the result of his illness from rheumatism in the early 1930's, which has also been characterized as hypertrophic arthritis in the record, caused a loss or reduction in wages or created any disability that prevented him from earning a living. The questions involved in this matter relate to the construction to be placed upon § 176.13, the applicable provisions of which read as follows:

"If an employee receives an injury which of itself would cause only permanent partial disability, but which, combined with a previous disability, does in fact cause permanent total disability, the employer shall only be liable for the permanent partial disability caused by the subsequent injury.

"(a) In addition to compensation for such permanent partial disability and after the cessation of the payments for the prescribed period of weeks, the employee shall be paid by the state the remainder of the compensation that would be due for permanent total

disability, as provided for by section 176.101, subdivision 3 (1-42 inclusive), out of a special fund known as the special compensation fund."[1]

It seems clear from a reading of the statute that, for Rikala to be entitled to receive benefits from the special compensation fund, he must first prove that he suffered an injury which of itself caused only permanent partial disability but which, "combined with a previous disability," in fact caused him to become permanently totally disabled. The first and foremost question must then be whether the employee in the instant case suffered from a "previous disability" within the meaning of the Workmen's Compensation Act. This court has heretofore held in the Senske case that (232 Minn. 362, 45 N. W. [2d] 649) "Degenerative diseases such as arteriosclerosis *which progress normally and exist independently of an accidental injury* do not constitute a preexisting disability within the meaning of the compensation act." We have no difficulty in coming to the conclusion that hypertrophic arthritis, a disease involved in this case, comes within this rule. Moreover,

---

[1]Section 176.13(b). "Following July 1, 1953, no compensation shall be paid for permanent total disability from the special fund for injuries occurring after said date, except for second injury cases as provided in clause (a). All employees who are now receiving, or who may hereafter become entitled to receive, compensation for permanent total disability, as a result of injuries occurring before July 1, 1953, whether from the employer or from the special fund, after receiving the full amount of $10,000 for such disability, shall be paid from the fund an additional sum of not to exceed $5,000, in the same manner and with the same limitations, except as to amounts, at the rate of two-thirds of the wages they were receiving at the time of the injury which rendered them permanently totally disabled, subject to a maximum of $20 per week and a minimum of $13.50 per week, but the full amount of their wages if at the time of such injury they were receiving less than $13.50 per week. Payments to permanently totally disabled employees from such additional sum of $5,000 shall be made only upon petition by the injured employee to the industrial commission for the same, stating that the full amount of $10,000 has been received, or is due to be paid within 30 days, which petition shall be accompanied by an affidavit of a reputable physician stating that he has examined the employee and found him to be still permanently totally disabled."

this court has also held that medical opinions which do nothing more than speculate on the possibility that an injury may have aggravated a prior arthritic condition provide no basis for a finding that such aggravation resulted. Senske v. Fairmont & Waseca Canning Co. *supra.*

■ Mr. Justice Holt speaking for this court in Skoog v. Schmahl, having direct reference to the purpose of the statute providing for the special compensation fund, said (198 Minn. 506, 270 N. W. 130):

"The statute presents difficulties. It could not have been the intention of awarding compensation out of this special fund for every workman who has become permanently totally disabled after he has received compensation for permanent partial disability. There must exist a prior disability which, combined with the permanent partial disability caused by the accidental injury, produces the permanent total disability. If in spite of some previous injury or bodily handicap the employe is not disabled from earning his full wages, when by an accidental injury he is permanently partially disabled and compensated therefor, he cannot claim from this special fund for permanent total disability thereafter ensuing."

In considering employee's situation from the time of his illness from rheumatism, or hypertrophic arthritis according to the medical testimony, in either 1933 or 1934 as disclosed by the record, we find that he apparently had no illness afterward which interfered with his seeking regular employment such as working for employer, even though he had some aches and pains and suffered some stiffness of joints. He was apparently working without wage loss or disabling physical impairment, in that respect, at the time of the accident and previous thereto.

■ We find no basis in the record upon which it might be concluded that there was such previous disabling physical disability with which the permanent partial disability resulting from the injury would combine to produce permanent total disability satisfying the necessary requirements for payments from the special compensation fund. There is no satisfactory evidence upon which to base a finding that the permanent total disability claimed, and from

which he now suffers, has not come upon him both before and after March 4, 1943, through natural causes and degenerative effects of progressive hypertrophic arthritis. We have already stated that, if in any manner or form the injury disturbed or aggravated either employee's rheumatism or his hypertrophic arthritis into a disability, the employer-insurer was liable to compensate for the full disability so caused.

The relator, in addition to contending that the employee herein did not suffer from a "previous disability" within the meaning of the Workment's Compensation Act, further contends that it is contrary to law to attempt to make an award of any form for temporary total disability out of the special compensation fund and that the order of the Industrial Commission awarding employee herein the sum of $379.73 from the special compensation fund is not in conformity with the terms of the Workmen's Compensation Act for the reason that Rikala settled his claims in full under the stipulation and award of May 2, 1951, upon being paid a total compensation of $9,620.27; that he had not been paid the full requisite amount of $10,000 which the relator contends that he must have been paid in compliance with the terms and provisions of the statute before proceeding to recover from the special compensation fund; and that therefore the recovery of $379.73 from the special fund is unwarranted. In view, however, of the conclusions reached, the latter contention may well be unimportant.

This court in Senske v. Fairmont & Waseca Canning Co. in considering an award on stipulation said (232 Minn. 360, 45 N. W. [2d] 648):

"* * * if an award is once made on a properly approved settlement, such an award may be considered as establishing that the employe's right to compensation for which the employer alone is responsible has been exhausted, and to provide, therefore, the necessary prerequisite to a consideration of whether the employe is entitled to receive further benefits from the special fund by reason of a combined disability which is both permanent and total."

We are, upon the record herein, forced to conclude that Rikala had no "previous disability" within the meaning of the provisions of the Workmen's Compensation Act which provide for and govern payments from the special compensation fund, when injured on March 4, 1943, with which the permanent partial disability received on the last-mentioned date could combine to produce the required permanent total disability now alleged to be present, but that rather the permanent total disability from which he now suffers is due to causes or diseases progressive in their nature which preceded the injury and had their independent and normal progression thereafter.

The medical testimony will not sustain a finding that the actual hypertrophic arthritis was due to trauma or the accidental injury, but only that it was a condition or disease existing prior to the injury, and in its nature a progressive type, nor will the medical testimony considered together with all other testimony as a whole aid in reaching a conclusion to the contrary.

The conclusions reached and the rules enunciated in Senske v. Fairmont & Waseca Canning Co. *supra,* and Skoog v. Schmahl, *supra,* are controlling here. The decision of the Industrial Commission is reversed. Findings and a determination which conforms to this opinion are in order.

Reversed.